MANUFACTURERS' INS. CO. (BILSON v.). See Case No. 1,410.

MANUFACTURERS' INS. CO. (CLARK v.). See Case No. 2,829.

MANUFACTURERS' INS. CO. (GLIDDEN v.). See Case No. 5,482.

## Case No. 9,051.

### In re MANUFACTURERS' NAT. BANK.

[5 Biss. 499; 19 Int. Rev. Rec. 20; 1 Thomp. Nat. Bankr. Cas. 192; 6 Chi. Leg. News, 118; 8 Am. Law Rev. 614; 1 Cent. Law J. 19; 21 Pittsb. Leg. J. 80, 116; 6 Leg. Gaz. 21.] [1]

District Court, N. D. Illinois. Dec. 30, 1873.

NATIONAL BANKS — AMENABLE TO THE BANKRUPT ACT—CURRENCY ACT—REPEALED — SUPERSEDED —CURRENCY ACTS—CUMULATIVE ACTS — REMEDIES—WHEN EXCLUSIVE.

1. A national bank is not liable to be proceeded against in bankruptcy.

2. The bankrupt act [of 1867 (14 Stat. 517)] does not repeal or supersede the provisions of the national currency act [13 Stat. 99] for winding up insolvent national banks.

3. Nor can the two acts exist together, as furnishing concurrent or co-ordinate remedies. The remedies prescribed in such case under the bankrupt act are not so ample and complete as those under the currency act, and the fact that creditors can not of their own motion institute proceedings under the currency act does not change the construction of the acts.

4. Nor did congress intend to inject the provisions of the bankrupt act, so that creditors could apply the remedies of the one, and the comptroller the remedies of the other. Such a construction would inevitably produce confusion.

5. When the legislature creates a corporation, it can also prescribe what remedies shall be had against it, and such remedies then become exclusive.

[Cited in Ryan v. Ray, 105 Ind. 106.]

This was an application by R. J. Smith & Co., of Chicago, for a rule on the Manufacturers' National Bank of Chicago to show cause why it should not be adjudged a bankrupt. The petitioners were creditors of the bank for money deposited in the ordinary course of business prior to its suspension of payment on the 17th day of October, 1873, and the petition was in the ordinary form, alleging suspension of payment of its commercial paper for a period of over 14 days, and preferential payments made to other of its creditors.

Harding, McCoy & Pratt and T. C. Whiteside, for petitioners.

Lawrence, Winston, Campbell & Lawrence and Ayer & Kales, for the bank.

[2][Extracts from argument of Harding, McCoy & Pratt:

[If this proceeding in bankruptcy can be maintained in no conceivable state of case against a national bank, then it is not true that it can be sued as natural persons; it is not true that proceedings may be brought against it in this court as in similar cases against others; it is not true that the provisions of the bankrupt act apply to all moneyed, business, or commercial corporations and joint-stock companies; and it is true that our lawmakers, when they used these clear and explicit terms, putting a national bank in the courts on the same footing with every other natural person, with every other like corporation, did not mean what they have so plainly said, but meant, instead, to confer a privilege, and an exemption from the most speedy and effectual weapon of the law, upon the class of corporations who need such exemption least,—who pretend and profess to take and keep in charge the moneys of others as trust funds, and to be ever ready to pay them on demand. Modern courts have long since denied to themselves the privilege of making laws by foisting interpretations upon statutes, by construction; but the books may be searched in vain for a case resembling this, where the explicit terms of statutes are to be overruled, not from motives of an acknowledged public policy, not to correct mistakes or omissions of legislators, but in order to defeat that expressed policy,—a policy which is the spirit of our institutions, a policy of equity and equality before the law, for one of privilege and exemption from common duties and liabilities. The decision which we ask from your honor will repudiate this unjust distinction, and will be regarded with gratification by every sound bank. It will vindicate them from odium which would attach to such a privilege, which they need less than

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission. 8 Am. Law Rev. 614, contains only a partial report.]

[2] [From 6 Chi. Leg. News, 118.]

any other institutions,—which they have never needed in their history.

[The national banking system is new and untried; it has had but a brief existence, of less than ten years; it is now called upon, for the first time, to go through a panic, and undergo a strain. But now it is to be tested; and nothing could be more cowardly than for the custodians of the money of others to lie down in the possession of the means of life,—of the reserves and active means of others,—and while others, their depositors, are subjected to severe and swift remedies of the law, of bankruptcy, to set up an exemption and the privilege to get the time which they, in the very nature of their indebtedness, have pledged themselves never to take. What reason can be suggested why the wise policy of the bankrupt act should not extend to these powerful institutions? It is inconceivable that congress, which, in the bank act itself, puts these banks on the same level, subject to the same proceedings and suits as all other persons and corporations, should change this, which is, in this particular, their acknowledged and unquestioned spirit and policy touching these banks. What color is there for this pretended discovery of a contrary spirit which shall overrule the very letter of the law? It is inconceivable that, if congress meant to change this policy, that they should neglect and fail to say so; that they should have left their meaning to inference. to interpretation,—to subtle inference, to be drawn from an unexpressed spirit which is not found in the bank act, or sudden intention conceived to create a distinction, where they had before repudiated distinctions and differences in creating the banks. This is simply, in its essence, a claim of a privilege said to be granted by the bank act; and "the uniform language of the English and American law is that all grants of privilege are to be liberally construed in favor of the public, and, as against the grantees of the monopoly, franchise. or charter, to be strictly interpreted. Whatever is not unequivocally granted in such acts is taken to have been withheld." Sedg. St. & Const. Law, p. 339. This doctrine has been repeatedly declared in cases where the corporation has contended for implied immunities. such as an exemption from taxation; and the supreme court of the United States, in Beatty v. Lessee of Knowles, 4 Pet. [29 U. S.] 152, lay down this doctrine and say, "This privilege can only be granted by express words." In Pennsylvania R. Co. v. Canal Commissioners, 21 Pa. St. 9, this doctrine is thus laid down: "No privilege is granted unless it be expressed in plain and unequivocal words, testifying the intention of the legislature in a manner too plain to be misunderstood, and every resolution which springs from doubt is to be against the corporation."

[The question here raised may be stated thus: How does the provision of the 50th section, providing for proceedings by the comptroller to take away the franchise of a bank, and dissolve it, forbid the remedy given by the 8th and 37th sections, viz. to sue and be sued, proceed and be proceeded against, in bankruptcy or otherwise, as natural persons in similar cases? These are distinct and cumulative remedies given, it may be (they are not in fact), for the enforcement of the same rights, but not given in the same statute. What has the law, touching the distinct rights given in different statutes, to do with this? The doctrine as to a new remedy is the reverse of that as to a new right. Remedies may be inconsistent, may be unlike; but the only consequence is that the injured party must make choice of which he will avail himself. But it is not true in fact that the bank act contains the supposed complete "scheme of bankruptcy." This is a strange scheme of insolvency—of bankruptcy—seen in the bankruptcy act by the lynx eyes of my brethren, who appear for this bank; a scheme which does not recognize or provide for insolvency at all.

[The provisions for a receiver are for nonpayment of a circulating note, for improperly certifying a check, for not making good the reserve, for not keeping good the surplus, for not keeping the stock to its minimum! Not one for insolvency! Not one for an act of insolvency! All for breaches of regulations required by good banking. Each and all of these breaches might be the act of a solvent bank! What connection between insolvency, and certifying a check without having the money deposited! These are sound rules, the observance of which will tend to keep a bank solvent. This proceeding is a statutory remedy to enforce statutory penalties. What parallel proceeding for the same acts is found in the bankrupt act? None. parallel or otherwise, save that for nonpayment of the circulating note. It is no act of bankruptcy to let your reserve run down, to let your surplus run down, to let your stock remain in quantity below its minimum amount, to certify a check for one who has not on deposit the funds to meet it! Suppose it were true that the provisions for a receiver are provisions for insolvency, are there not in the 8th and 57th sections also provisions for insolvency—provision for the action of the courts—for the power of a court of chancery, for the power of a court of bankruptcy, for receiver and assignee? What then? Here are simply concurrent remedies in the same act! Say this remedy stood upon the terms alone of the bankrupt act, as our opponents, without any show of argument or reason, claim, and then, what if the proceedings by the comptroller are inconsistent or unlike those of the bankrupt court? So are, or may be, the proceedings in chancery, in admiralty, in law; so certainly will those be in independent courts; but this furnishes no reason to deny that the law provides for them—to assert that provisions for one

forbid the operation of provisions for the other? But counsel see possible collusion, in case the comptroller has the right to act. It ought to be enough to answer that it does not appear, and that it should first be made to appear that he has the right to act, that there are circulating notes; that they are, or may be, protested. This, by all means, as there are banks which have no circulation. As it is the first act of a bank to redeem, if it can, its notes, and it may have been done by this bank, by the consent of the comptroller, and to put it in funds by the surplus value of its bonds, it ought to be enough to answer, that it is no reason to ask the court to stay its hand, because the comptroller, or even another court, has the right also to act. The rule applying is, first in time first in right. But it is easy, also, to answer that it is inconceivable that the comptroller should desire to act where the same court would act and control his receiver; where the same rule of distribution, so far as the circulating notes go, is preserved, the lien of government being protected in bankruptcy. That is still more inconceivable when, as now, the circulating notes are known to be worth far less, at their par value, than the bonds at their present premium. "But the whole proceeding is different!" Of course it is. Its source, its cause of institution, and its progress differ at each step. The result and effect of the proceedings are just as different; the one closes up and dissolves the bank; the other simply distributes its property among its creditors. But, to the injury to government; do they differ materially, and to a complication? Certainly not. The same court controls. The same law, the same rules control. The officer who acts under the comptroller is called a receiver; but he is under the control of this court, and must ask its advice and seek its aid at every important step. The money is paid over to the comptroller,—to the treasurer! Of course. But for what? For distribution. It is of no advantage for the government, is it, to assume the duty of custodian? Is there danger of loss in the hands of the assignee? So there is in the hands of the receiver. All the money belonging to the government is by the assignee paid over to the United States treasury; the receiver does the same. Here the security and interests of the government are at least balanced. The moneys of other people are paid over to them; and here there is less danger of loss to the government, as it takes no risks. But the comptroller might come in and take the property from the hands of the assignee! Indeed! That is as good a reason why any suit or other proceeding could not go on, could not be effectual, why property would be sacrificed upon sale upon execution! The comptroller could not appoint a receiver, and receiver seize it! This is thus seen to be a chimera. It is not and cannot be true, for it proves too much. It would defeat all suits against the bank. Should the comptroller wish to appoint a receiver for mere malice, mere exercise of power, all the rights and interests of the government protected, he would be answered, it is too late. Or if not, his action would simply supplement that of this court; his receiver would be the quondam assignee, or could take his place, and no friction could occur, as the machinery is all under control of the same court. In Kennedy v. Gibson, 8 Wall. [75 U. S.] 429, all that is decided is that a suit cannot be brought by the receiver against the stockholders until the comptroller has directed him to bring it. All that is said in that case relates to a proceeding commenced by the comptroller under the 50th section of the act of June 3, 1864. It was not meant that the liability of stockholders could only be enforced by the comptroller, and under this section; but only that, in a proceeding under that section, certain action on the part of the comptroller was indispensable, whenever the personal liability of the stockholders is sought to be enforced.] [2]

BLODGETT, District Judge. On the 15th day of November last Messrs. R. J. Smith & Co. filed in this court their petition setting forth that they are creditors of the Manufacturers' National Bank, of this city, for money deposited with said bank in due course of business, and alleging that the said bank had suspended payment on its commercial paper for over fourteen days, and had, when insolvent, made preferential payments, for which acts they prayed that the bank be adjudged bankrupt.

Being aware that grave doubts had been expressed by many lawyers and business men as to the application of the bankrupt law to national banks, I directed notice of the application for a rule to show cause to be served on the officers of the bank, and have heard arguments for and against the application.

The law now in force for the organization and government of national banks was enacted on the 3d of June, 1864 (13 Stat. 99), and has been amended by the act of February 4, 1868 (15 Stat. 34), the act of February 19, 1869 (Id. 270), the act of July 12, 1870 (16 Stat. 251), and the act of March 3, 1873 (17 Stat. 603). Embodied in the original act, are very full and ample provisions for winding up and settling the affairs of these banking associations, mainly through the federal courts. The fundamental purpose of the act and its amendments was to provide a national currency and insure its prompt redemption, and, incidentally, to provide banking or fiscal agencies through which the ordinary financial business of the country could be safely transacted.

The leading features of the system were: 1. The security of the circulating notes of those banks by the pledge of government

bonds in the hands of the treasurer of the United States, and in case of the failure of the bank to redeem its notes, then redemption of those notes by the government, for which it is to be reimbursed by the proceeds of the bonds deposited and a first lien on all the assets of the bank. 2. The responsibility of the stockholders of the bank to the extent of the par value of the stock held by them respectively, in addition to the amount invested in their shares. 3. The whole system is to be under the surveillance of the comptroller of the currency, with full powers to examine into the affairs of each bank, and in cases of non compliance with the provisions of the law, to appoint a receiver to administer and wind up their affairs.

On the 2d day of March, 1867, congress passed an act to establish a uniform system of bankruptcy throughout the United States; and by the thirty-seventh section of said act it is declared "that the provisions of this act shall apply to all moneyed, business, or commercial corporations and joint-stock companies," and by the third clause of the same section it is declared that "all payments, conveyances, and assignments declared fraudulent and void by this act, when made by a debtor, shall in like manner and to the like extent and with like remedies be fraudulent and void when made by a corporation or company."

The forty-eighth section declares that the word "person" when used in this act, shall be held to include and mean "corporation," and by the ninth clause of the thirty-ninth section it is made an act of bankruptcy for any "banker" to suspend payment of his commercial paper for fourteen days. The bankrupt law is the latest expression of the legislative will, and its general terms and provisions must be held to repeal all previous statutes necessarily incompatible with it. The question then is, does the bankrupt law repeal and supersede the provisions in the currency act for winding up the affairs of insolvent national banks? or can its provisions be applied to those corporations and leave intact the provisions of the currency act on the same subject? There is no doubt of the soundness of the general rule of interpretation cited by the counsel for the respondent: That a statute, although so general in its terms that its letter would comprehend all classes of persons and things to which it can relate, will nevertheless be construed by the courts as not applying to a particular class which has been specially provided for and regulated by another statute relating solely to such class, if there is no language in the general statute, repealing the former statute or in any manner referring to it. Hume v. Gossett, 43 Ill. 297; People v. Miner, 46 Ill. 384.

A thing which is in the letter of a statute is not within the statute, unless it be within the intention of the makers. Bac. Abr. tit. "Statutes," 3S5. "Where the intention of the legislature is not apparent to that purpose, the general words of another and later statute shall not repeal the particular provisions of a former one." Dwarris, St. 117, quoted from Coke. The rule is thus stated in Sedgwick on the Construction of Statutory and Constitutional Law (page 97; 2d Ed.): "In regard to the mode in which laws may be repealed by subsequent legislation, it is laid down as a rule, that a general statute without negative words will not repeal the particular provisions of a former one, unless the two acts are irreconcilably inconsistent. * * * * The reason and philosophy of the rule is, that when the mind of the legislator has been turned to the details of a subject, and he has acted upon it, a subsequent statute in general terms, or treating the subject in a general manner, and not expressly contradicting the original act, shall not be considered as intended to affect the more particular or positive previous provisions, unless it is absolutely necessary to give the later act such a construction, in order that its words shall have any meaning at all."

The currency act provides for the appointment of a receiver to wind up the affairs of a national bank in the following cases: 1. For not keeping good a surplus—12th section. 2. For not keeping stock at minimum—15th section. 3. For not keeping good its reserve—31st section. 4. For not selecting a place for the redemption of its notes—32d section. 5. For holding its own stock over six months—35th section. 6. For non-payment of its circulating notes—50th section. 7. For improperly certifying a check—section 1, act March 3, 1869. 8. For failure to pay up capital stock, and for allowing same to become and remain impaired by losses—section 1, act March 3, 1873.

Upon the happening of either of these contingencies the comptroller may appoint a receiver to take possession of all the books, records and assets of the corporation, who shall proceed to convert the assets into money under the direction of a court of competent jurisdiction. And the money so realized shall be paid over to the treasury of the United States, subject to the order of the comptroller, who, after deducting in full whatever amount shall be due to the United States, shall distribute the balance ratably among the creditors of the bank; the claims of creditors to be proven before the comptroller, or adjudicated in a court of competent jurisdiction.

By the 52d section the "application of its assets in the manner prescribed by this act, with a view to the preference of one creditor to another, except in payment of its circulating notes, shall be utterly null and void." And by the 48th section it is made unlawful for any such bank, after suffering a protest of its circulating notes, and after notice from the comptroller, to in any manner prosecute the business of banking, except to receive and safely keep its money and deliver special deposits. And by the 53d section, any violation of the provisions of the cur-

rency act, done knowingly, by either a bank, or its officers or agents, works a forfeiture of all its rights and franchises, to be adjudged by a federal court at the suit of the comptroller. The 8th section provides that said corporations, i. e., national banks, may sue and be sued, complain and defend, in any court of law and equity as fully as natural persons. And by the 57th section it is declared, that "suits, actions and proceedings against any association under this act may be had in any circuit, district or territorial court of the United States, held within the district in which such association may be established, or in any state, county, or municipal court in the county or city in which such association is located, having jurisdiction in similar cases." And by the amendment to this section, made by the act of March 3, 1873, it is further provided that "no attachment, injunction or execution shall be issued against such association or its property before final judgment."

I am not aware that any adjudication has yet been made, determining what is an "act of insolvency" within the intent and meaning of the 52d section, but it seems to me to be an act which shows the bank to be insolvent; such as non-payment of its circulating notes, bills of exchange, or certificates of deposit; failure to make good the impairment of capital, or to keep good its surplus or reserve; in fact, any act which shows that the bank is unable to meet its liabilities as they mature, or to perform those duties which the law imposes for the purpose of sustaining its credit.

It will thus be seen that while the currency act does not specify in detail, and provide for all the specific acts of bankruptcy enumerated in the bankrupt law, it yet does furnish, through the functions of an important public officer—the comptroller of the currency—a very complete and detailed scheme or plan for administering the affairs of an insolvent national bank. It is true there is no provision for an individual creditor's putting this machinery in motion. But the presumption is that congress deemed it wiser to leave this duty to an impartial public officer rather than entrust it to the hasty, inconsiderate, and perhaps selfish action of one or more creditors. It was probably thought that the necessity of maintaining the public confidence in the system was such as would compel the comptroller to act in all cases when a bank had become derelict or discredited, and that this consideration, together with the clear obligations of duty, thrown upon the officer, would be sufficient to insure his action in all cases where he acquired the right to do so. At all events, the law as it was enacted contained ample and specific provisions for creating and managing these corporations, and for administering their affairs when they became unable or refused to perform their public functions.

The system has been in operation nearly ten years. Over two thousand banks have been organized under it. Of these, twenty-one have been wound up through the agency of the comptroller and a receiver—the great part of them since the enactment of the bankrupt law. All the legislation of congress has looked toward the perfecting and perpetuation of the system, and ought we now to say that congress, by the enactment of the general bankrupt law, intended to place these corporations under the provisions of that law, and to repeal the elaborate plan which it had specially furnished for winding up their affairs when they became insolvent or incapable of transacting banking business?

That it did not intend to repeal them, is conclusively evidenced by the fact that in two of the important amendatory acts, those of March 3, 1869 (15 Stat. 326), and March 3, 1873, especial reference is made to those winding-up provisions of the original act, and they are treated as being in full force. So, too, in several cases which have been before the supreme court since the enactment of the bankrupt law, reference has been made to these winding-up powers as still in force.

It being clear, then, that congress did not intend to repeal the winding-up clauses of the currency act, the question arises, did it intend that the two remedies, that is, the one given by the currency act and the one given by the bankrupt act, should exist as co-ordinate or concurrent remedies, and the affairs of an insolvent national bank be administered by that tribunal which first acquired control.

This construction might be admitted if the two were entirely compatible with each other, or if each was equally as complete as the other,—that is, if each could reach and administer upon all the assets of the debtor bank so as to leave nothing to be done by the other.

But we find upon examination that the important duty of paying the holders of circulating notes, and distributing the proceeds of the bonds deposited to secure them or the surplus of those bonds, and of enforcing the liability of stock-holders, is left with the comptroller, and can only be enforced by or through him. This latter point was fully discussed and decided by the supreme court, Kennedy v. Gibson, 8 Wall. [75 U. S.] 498, where it was expressly held that the comptroller alone could enforce the personal liability clause. The court says: "The receiver is the instrument of the comptroller. He is appointed by the comptroller, and the power of appointment carries with it the power of removal. It is for the comptroller to decide when it is necessary to institute proceedings against stock-holders to enforce their personal liability, and whether the whole or a part, and, if a part, how much, shall be collected. These questions are referred to his judgment and discretion, and

his determination is conclusive. The stockholders can not controvert it.

"It is not to be questioned in the litigation that may ensue. He may make it at such times as he shall deem proper, and upon such data as shall be satisfactory to him. This action on his part is indispensable, when the personal liability of the stockholders is sought to be enforced, and must precede the institution of a suit by a receiver. * * * The claims of creditors may be proved before the comptroller or established by suit against the association. Creditors must seek their remedy through the comptroller in the manner prescribed by statute."

Much stress was laid by the attorneys for petitioners upon the inadequacy of the security for creditors under the currency act, mainly because creditors could not of their own motion initiate winding-up proceedings, but how much more inadequate would the bankrupt court be to the same end if it cannot reach or distribute assets and perhaps must pay what it gets over to a government officer for distribution.

I do not say that an assignee would be obliged to pay over to the treasurer, but that there is grave ground for a claim that he should do so, and that collision might grow out of such claim. The relief which could be afforded to the creditors of a national bank, then, being so incomplete, I cannot think it was the intention of congress to clothe bankrupt courts with jurisdiction over this class of corporations. I have already cited the evidence which shows to my mind that congress did not intend to repeal the winding-up provisions of the currency act by the passage of the bankrupt law, and a comparison of the provisions of the two acts shows with equal clearness to my mind that it did not intend to inject the provisions of the bankrupt act into the currency act, so that creditors could apply the remedies of the bankrupt act, and the comptroller the remedies of the currency act; because such a construction would inevitably produce collisions and conflicts of jurisdiction, and the remedies given by the bankrupt act would be so far unavailing in regard to important assets as to make it evident that there was no intention to apply such a remedy. Suppose this court were to adjudge this respondent bankrupt to-day, and send its messenger and assignee to take possession of the assets, the officer of the court could in no event enforce the personal liability clause, or obtain possession of the government bonds deposited to secure the circulation, or any surplus of those bonds after fully redeeming the circulation. Those assets are beyond the reach of this court or its officers, and can only be approached by the way of the comptroller and his receiver. Then why should this court take cognizance of a case that it cannot administer?

Why not, rather, say that congress has acted upon the subject matter of insolvent national banks and made specific provisions for administering their affairs, and, inasmuch as the general bankrupt law has not expressly repealed these specific provisions nor necessarily suspended them, the courts will presume it was the intention of congress to except this class of corporations from the operation of the later statute? Such conclusion seems to me consistent with authority, and is, in fact, the only conclusion that will not lead to inextricable complication and conflict.

But it is urged that the currency act makes these corporations liable to all suits and actions which might be brought against natural persons, and that they can therefore be proceeded against in bankruptcy. A sufficient answer to this might be found in the fact that when the currency act was passed there was no bankrupt law in force, and therefore the general language must be held subject to this limitation. But I take it there is no doubt that the legislative power which creates an artificial person or corporation can also prescribe what remedies shall be had against it, and that such remedies would be held to be exclusive, and that the provisions of the general bankrupt law would not be held to apply to corporations at all but for the express terms of the act. Should they, then, be held to apply to a class of corporations which have, as it seems, a bankrupt law of their own ingrained into their own constitution and part of their organic law, by the same authority which enacted the bankrupt law? I think not. Nor does it seem to me that there is any necessary hardship in denying the remedies of the bankrupt law to the creditors of this corporation. There is no evidence that either this petitioning creditor, or any other creditor, has applied to the comptroller to take possession and administer the assets. Additional force is also given to this consideration from the fact that in the very latest amendment to the currency act it is expressly provided that no attachment, injunction, or execution, shall issue against a bank until judgment is obtained.

It is well known that in many of the states proceedings by attachment may be taken by a creditor in the first instance, and as a matter of course, and in nearly or quite all the states, attachments can issue upon affidavits showing the existence of certain facts, while injunctions are almost universally issued before judgment or decree in equity cases when a case is made for one. And yet these corporations are, probably for reasons of public policy, exempted from liability to all this class of summary proceedings. Here we have a restriction upon the powers of the bankrupt court, almost, if not wholly, incompatible with the jurisdiction. For of what use would it be to proceed in bankruptcy against a debtor, in a large number of cases, unless he could be enjoined and his property seized by process of the court. Be-

fore adjudication or judgment could be obtained, the property of the debtor might be wasted or spirited away, so that the adjudication would be barren of results.

I do not say that the prohibition to enjoin, or attach property necessarily implies want of jurisdiction, but only that it goes far to show that it was never the intention of congress to clothe a bankrupt court with jurisdiction as against these corporations. I am therefore of the opinion that the rule to show cause should be denied, and the petition dismissed for want of jurisdiction.